**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

        **v.**              **Criminal No.** 15-576 (FAB)

FRANCISCO MARTINEZ-MERCADO,

    **Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

    On February 26, 2016, after a five-day trial, a jury found Francisco Martinez-Mercado ("Martinez") guilty of conspiring to injure, oppress, threaten, or intimidate a person in the enjoyment of that person's constitutional right to be free from unreasonable searches and seizures in violation of 18 U.S.C. § 241. Before the Court are defendant Martinez's motions for a judgment of acquittal, (Docket No. 171), and for a new trial, (Docket No. 170). The United States opposes both motions. (Docket Nos. 172, 175.) For the reasons that follow, defendant's motions are **DENIED**.

## I.   FACTUAL BACKGROUND

    The Court summarizes the key facts in a light most compatible with the jury's verdict and in a manner consistent with the trial record. See United States v. Valerio, 676 F.3d 237, 240 (1st Cir. 2012); United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011).

    In September 2010, defendant Martinez was a Task Force Officer for the United States Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF").  Martinez had previously worked in the Drugs Division of the Puerto Rico Police Department ("PRPD"), where Sergeant Jorge Fernandez Aviles ("Fernandez") was his supervisor.

On September 15, 2010, Martinez called Sergeant Fernandez to ask him for help with a "job" that he was going to do in Carolina. Sergeant Fernandez had a reputation for being corrupt, and corrupt officers used the word "job" to refer to an illegal, money-earning activity.

After hanging up the phone with Martinez, Sergeant Fernandez called Pedro Lopez-Torres ("Lopez"), who he previously supervised in the PRPD Drugs Division and who was now working as a police officer in the PRPD Property Division of the Criminal Investigations Unit in Carolina.  Sergeant Fernandez and Lopez had done "jobs" together in the past.  Sergeant Fernandez told Lopez that someone working for the ATF named Martinez was going to do a "job" in Carolina and needed help.  After Sergeant Fernandez reassured Lopez that he had done "jobs" with Martinez in the past and that he was trustworthy, Lopez told Sergeant Fernandez to give Martinez his phone number.

Minutes later, defendant Martinez called Lopez.  Lopez asked Martinez if they could meet in person because "jobs" were never discussed over the phone.

Later that day, Lopez called Luis Ramos Figueroa ("Ramos"), a PRPD officer who Lopez trusted to do "jobs."  Lopez and Ramos met in person, and Lopez reassured Ramos that even though this "job"

would be with someone working for the ATF, Sergeant Fernandez had said that the person was trustworthy. Officer Ramos agreed to participate in the "job."

Days later, defendant Martinez and Lopez met in person to discuss the "job." Martinez explained that he had some thugs who were going to break in to a condominium that belonged to someone who the ATF had recently arrested. The thugs would steal money, jewelry, and drugs from inside. Martinez asked Lopez if he could help, and Lopez said that he could provide security.

Lopez told Martinez that they would have to do the "job" during Lopez's work hours, which were Monday through Friday from 4:00 p.m. to midnight. Lopez explained that he would sit in his patrol car near the condominium while the robbery took place. This would give the impression to the public that the area was safe and that a crime was not being committed. While sitting in his patrol car, Lopez would listen to the police radio to hear if any complaint came in regarding the robbery. If a complaint came in, he would alert the thugs in the condominium so that they could leave immediately. Lopez also explained that he would be in charge of investigating any complaint that came in because his official duties included investigating home invasions and thefts in Carolina. Lopez said that he would deviate the investigation so that no one would get caught.

After meeting with defendant Martinez in person, Lopez met with Ramos and gave him the details of the "job." Lopez told Ramos

that the "job" would happen in the following days, and that as soon as he got word from Martinez, he would let Ramos know.

On September 23, 2010, defendant Martinez contacted Lopez and told him that the "job" was going to take place that evening. Lopez called Ramos to relay the information.

Lopez started his shift at 4:00 p.m. that day.  At about 7:00 p.m., he drove his patrol car to the parking lot of a Pueblo supermarket to meet defendant Martinez.  Martinez was driving a minivan, and Lopez could see silhouettes of two people in the minivan with Martinez.

Ramos arrived at the Pueblo parking lot and joined Lopez in his patrol car.  Martinez then signaled to Lopez and Ramos that it was time to go.  Lopez and Ramos, in Lopez's patrol car, followed defendant Martinez to the PlayaMar Condominium.  Martinez turned into PlayaMar's parking area, and Lopez and Ramos continued to the end of the street, where Lopez parked the patrol car.  Two people got out of the minivan and entered PlayaMar.  Lopez and Ramos stayed close to PlayaMar, listening to the police radio.

A short while later, defendant Martinez and Lopez spoke on the phone.  Martinez told Lopez that the "job" went well, and that they would meet again in the Pueblo parking lot in thirty to forty-five minutes.  They met in the parking lot as planned, and defendant Martinez gave Lopez two stacks of money.  Each stack had about $1,200 to $1,500.  Lopez gave one stack to Ramos and kept the other for himself.  Lopez asked defendant Martinez for Sergeant

Fernandez's cut.  Martinez explained that there was not that much, only about $6,000 to $7,000 and some jewelry, and that he would handle giving Sergeant Fernandez his money.

Defendant Martinez spoke with Lopez on the phone several times over the next week.  Lopez told Martinez that a complaint had been filed the morning after the robbery.  Lopez did not interfere with the investigation, however, because the complaint came in when Lopez was not on shift, and he did not want to raise suspicions by getting involved.

## II.  MOTION FOR A JUDGMENT OF ACQUITTAL

Defendant Martinez moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 both at the close of the United States' case and after the close of all the evidence. Martinez now renews his motion for a judgment of acquittal on sufficiency of the evidence grounds.  (Docket No. 171.)

A district court may set aside the jury's guilty verdict and enter a judgment of acquittal if the evidence is insufficient to sustain a conviction.  See Fed. R. Crim. P. 29.  In assessing sufficiency, the Court "take[s] into account all evidence, both direct and circumstantial, and resolve[s] evidentiary conflicts and credibility disputes in favor of the jury's verdict." Valerio, 676 F.3d at 244.  The Court will uphold the jury's verdict if the "evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United

States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009) (quoting United States v. Cruz-Rodriguez, 541 F.3d 19, 26 (1st Cir. 2008)).

Defendant Martinez was convicted of violating 18 U.S.C. § 241, which makes it criminal for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution." See 18 U.S.C. § 241; Docket Nos. 3, 167. The constitutional right at issue here was the victim's Fourth Amendment right to be free from unreasonable searches and seizures. Thus, to convict Martinez, the United States had to prove beyond a reasonable doubt that he "1) conspired to injure, oppress, threaten, or intimidate [the victim], 2) with the intent to interfere with the victim's [Fourth Amendment] rights, 3) under color of state law." See United States v. Cortes-Caban, 691 F.3d 1, 13 (1st Cir. 2012) (quoting United States v. Guidry, 456 F.3d 493, 507 (5th Cir. 2006)).

Defendant Martinez does not challenge that the United States proved the first element, that he conspired to injure, oppress, threaten, or intimate the victim. Rather, Martinez argues that the United States did not present sufficient evidence to prove the second and third elements - that the object of the conspiracy was to interfere with the victim's Fourth Amendment Rights under color of law. (Docket No. 171.)

## A.   Victim's Fourth Amendment Rights

Martinez contends that the United States did not prove that the conspiracy targeted the victim's Fourth Amendment rights. (Docket No. 171 at pp. 2-4.)  Specifically, Martinez argues that there is insufficient evidence to show that the victim had the requisite reasonable expectation of privacy in the place searched the property seized.  Id.

The Fourth Amendment protects people "against unreasonable searches and seizures" of their "persons, houses, papers, and effects."  U.S. Const. amend. IV.  This protection applies only when the person has "a legitimate expectation of privacy in 'the place searched or the thing seized.'"  United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009) (quoting United States v. Thornley, 707 F.2d 622, 624 (1st Cir.1983)).  "Without question, the home is accorded the full range of Fourth Amendment protections."  Lewis v. United States, 385 U.S. 206, 211 (1966).  If a person abandons her property, however, she loses Fourth Amendment protection of it. United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993) (explaining that abandonment is determined by "act and intent" and may be inferred from "all the relevant circumstances").

Here, Lopez testified that he and defendant Martinez agreed to do a "job" that involved breaking in to a condominium that belonged to someone who the ATF had recently arrested and stealing money, jewelry, and drugs from inside.  This proves that the conspiracy had an intended victim:  the person who the ATF had recently

arrested.  It also proves that the intent of the conspiracy was to search to the person's home, a place that is accorded full Fourth Amendment protection, and to seize items from inside.

Photographs taken of the inside of the condominium the morning after the break-in depict kitchen cabinets full of food, dishes in the sink, items on the a dining room table, photographs and greeting cards on a dresser in the bedroom, clothes in the dresser drawers, sheets and pillows on the bed, and a blanket on the couch. See Gov't Exh. 11.  A reasonable jury could infer from these photographs that the condominium was occupied and not "abandoned" at the time of the break-in.

The Court finds that the United States presented sufficient evidence to enable a rational jury to conclude beyond a reasonable doubt that Martinez entered into a conspiracy, the object of which was to interfere with the victim's Fourth Amendment right to be free from unreasonable searches of his home and seizures of his belongings.  The Court next addresses whether this interference was intended to be carried out under color of law.

**B.   Under Color of Law**

Defendant Martinez argues that the United States did not prove that the conspiracy intended to interfere with the victim's rights while acting "under color of law."  (Docket No. 171 at pp. 4-7.)

"[A] police officer who exercises, but misuses or exceeds, his lawfully possessed authority is generally thought to be acting under color of law."  Martinez v. Colon, 54 F.3d 980, 986 (1st Cir.

1995).  "[W]hether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."  Id.  Although no "easily determinable factor will control whether a police officer was acting under color of state law," relevant factors include the officer's "garb," "duty status," "use of a service revolver," and the "location of the incident."  Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999).  The "key determinant is whether the [officer], at the time in question, purposes to act in an official capacity or to exercise official responsibilities."  Martinez, 54 F.3d at 986.  An officer's "private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law."  Id. at 986-87.

Here, Martinez argues that the involvement of officers Lopez and Ramos in the conspiracy was "tangential at best" and that their "mere presence" near the scene of the illegal search and seizure did not amount to "an actual exercise of apparent or real authority."  (Docket No. 171 at p. 5.)

The evidence presented at trial showed that defendant Martinez and Lopez agreed that the illegal search and seizure would take place on an evening when Lopez was on duty as a police officer in charge of investigating home invasions and thefts in Carolina, where the condominium was located.  Martinez and Lopez agreed that Lopez would sit in his patrol car near the condominium to give the

impression to the public that the area was safe and that a crime was not being committed.  Lopez would also listen to his police radio while the thugs were in the condominium, and if a complaint came in, he would alert the thugs to leave and would deviate the investigation.

Thus, Lopez's status as being on duty, the fact that his official duties at the time included investigating home invasions in the municipality where the illegal home invasion was to take place, and the use of his official patrol car and police radio are all factors that support the conclusion that the conspiracy intended for Lopez to act under of color of law.  See Barreto-Rivera, 168 F.3d at 45.

Thus, the Court finds that the United States presented sufficient evidence to enable a rational jury to conclude beyond a reasonable doubt that defendant Martinez entered into a conspiracy with the intent to interfere with the victim's Fourth Amendment rights under color of law.  Accordingly, the Court **DENIES** Martinez's motion for a judgment of acquittal.

### III.  MOTION FOR A NEW TRIAL

Defendant Martinez moves for a new trial pursuant to Federal Rule of Criminal Procedure 33.  (Docket No. 170.)  A district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Martinez bases his motion on allegations of (1) a Brady violation, (2) due process violations, and (3) judicial bias.  (Docket No. 170.)

## A.   Alleged **Brady** Violation

Defendant Martinez contends that he is entitled to a new trial because the United States violated its duty pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963), by delaying disclosure of a report of investigation until Sunday, February 21, 2016, the day before trial.  (Docket No. 170 at pp. 1-3.)

A defendant seeking a new trial based on an alleged Brady violation must establish (1) that the evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the suppression prejudiced the defendant. United States v. Mathur, 624 F.3d 498, 503 (1st Cir. 2010).  To establish prejudice, the defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Del-Valle, 566 F.3d 31, 40 (1st Cir. 2009).

Here, the report of investigation summarizes an interview that the Federal Bureau of Investigation ("FBI") conducted with PRPD officer Yaritza Cruz-Sanchez ("Cruz"), who went to apartment 1-A of the PlayaMar Condominium after receiving a complaint about a robbery. See Docket No. 170-1.  Defendant Martinez asserts that three parts of the report contain information that the United States was required to disclose timely pursuant to Brady.  The Court addresses each part in turn.

### 1.  "The Painter Did It"

Martinez claims that the report "provides an alternative perpetrator" of the robbery because it suggests that "the painter did it." (Docket No. 170 at pp. 2-3.)  The report states Cruz told the FBI that the robbery victim had accused a contract painter working at the PlayaMar Condominium of robbing him.  (Docket No. 170-1 at p. 1.)  Because the painter had several contracts with buildings in the area and was afraid that he would lose business as a result of being wrongfully accused, the painter called the police to report the robbery.  Id.  It was the painter's call that prompted Cruz to go to apartment 1-A of the PlayaMar Condominium to investigate the robbery.  Id.  Nothing in the report suggests that the police suspected that the painter had committed the robbery or that the victim had any basis for his suspicion.  The victim's initial accusation of the painter was pure speculation and therefore is not potentially exculpatory information that the United States was required to disclose pursuant to Brady.  See United States v. Ray, 61 F. App'x 37, 54 (4th Cir. 2003) (holding that government's delayed disclosure of a statement did not violate Brady because the statement was "sheer speculation" and "provided no details suggesting some concrete factual basis for th[e] conjecture").

### 2.  "They Entered Through the Front Door"

Martinez insists that the report provides an alternative theory of how the robbers entered the condominium.  (Docket No. 170

at p. 2.)   According to the report, Cruz stated that she had watched the security camera video from the building and that she recalled that it showed individuals entering the condominium through the front door, not through the balcony door.  (Docket No. 170-1 at pp. 1-2.)  None of the United States' witnesses, including co-conspirators Lopez and Ramos, testified that they saw how the thugs hired by defendant Martinez entered the condominium.  A PRPD officer who took photographs of the condominium the morning after the robbery, however, testified that the condominium's balcony door appeared like it had been forced open to gain entry into the condominium, and photographs that he took corroborated this testimony.  See Gov't Exh. 11 at pp. 6-7.  The report's suggestion that the robbers actually entered through the front door conflicts with the United States' evidence that it appeared that they entered through the balcony door and thus, has some impeachment value.

"Impeachment evidence must be material," however, "before its suppression justifies a new trial."  Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005).  Suppressed impeachment evidence is not material if it "is cumulative or impeaches on a collateral issue."  Id. at 189.  Here, the evidence is both cumulative and on a collateral issue.

First, the report is cumulative of the testimony of PRPD officer Jose Ivan Bellavista-Ruiz ("Bellavista"), who defendant Martinez called to the stand.  Bellavista was with Cruz when she responded to the robbery complaint at PlayaMar.  Bellavista

testified that he watched the security camera video from the building, and that it showed two individuals entering the condominium through the front door.[1] Thus, as to this information, the report is cumulative. See Conley, 415 F.3d at 189 ("Suppressed impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value.").

Second, and more significantly, whether the robbers entered the condominium through the front door or the balcony door or both is a completely collateral issue. Defendant Martinez was charged with violating 18 U.S.C. § 241, which makes it a crime to conspire to interfere with constitutional rights and which does not require an overt act in furtherance of the conspiracy. See United States v. Crochiere, 129 F.3d 233, 234 (1st Cir. 1997) (holding that 18 U.S.C. § 241 "does not require an overt act"). Accordingly, the United States did not have to prove that the robbery actually took place. Therefore, how the robbers entered the condominium is irrelevant to the elements that the United States had to prove. See United States v. Paladin, 748 F.3d 438, 448 (1st Cir. 2014) (explaining that a matter is collateral if it is "not relevant in the litigation to establish a fact of

---

[1] Bellavista also testified, during cross-examination, that he recalled seeing damage to the balcony door consistent with the damage depicted in Government Exhibit 11.

consequence" (quoting United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993))).

Thus, although information in the report had minor impeachment value concerning how the robbers entered the condominium, the information was cumulative of evidence that defendant Martinez presented at trial and would have impeached on a collateral matter. Accordingly, the United States was not required to disclose the information pursuant to Brady.

3.    **"Lopez Said That Drugs Were Taken"**

Martinez argues that the report contains information that contradicts Lopez's trial testimony. (Docket No. 170 at pp. 2.) According to the report, Cruz stated that her co-worker Lopez asked her if she had come from a burglary, and that Lopez told her that "material (referring to drugs) and money" were taken. (Docket No. 170-1 at p. 2.) Cruz stated that she thought this was "weird" because the victim had reported that only money was stolen, but that she "did not give it more thought" because Lopez "came from a drug division, [and] she figured he had good drug sources." Id. Defendant Martinez argues that this information contradicts Lopez's trial testimony that he did not go into the condominium and that Martinez told him immediately after the robbery that only money and jewelry were found inside. (Docket No. 170 at p. 2.)

The Court fails to see a contradiction. Although Lopez testified that defendant Martinez told him that only money and jewelry were taken, Lopez never testified as to his own knowledge

of what was stolen from the condominium or as to what he told Cruz. Lopez could have found out from other sources, or from Martinez himself sometime after the initial post-robbery conversation, that drugs were also stolen from the condominium. Alternatively, Lopez could have told Cruz that drugs were taken in an effort to get information about the investigation, which was consistent with the conspirators' plan. Whatever the case, there is no contradiction. Therefore, the statement in the report has no impeachment value.

Even if the information had impeachment value, the impeachment would target a collateral issue. As discussed in the previous section, because Martinez was charged with <u>conspiring</u> to interfere with constitutional rights, a crime for which there is no overt act requirement, the United States did not have to prove that the robbery occurred. What the robbers actually stole from the condominium is therefore irrelevant and a collateral matter. <u>See</u> <u>Paladin</u>, 748 F.3d at 448. Thus, the United States was not required to disclose this part of the report pursuant to <u>Brady</u>.

**4.   Conclusion: No <u>Brady</u> Violation**

Consistent with the Court's ruling on the third day of trial, the United States did not have a duty pursuant to <u>Brady</u> to disclose the report of investigation to defendant Martinez. <u>See</u> Docket No. 148. Accordingly, the Court **DENIES** defendant Martinez's motion for a new trial based on the alleged <u>Brady</u> violation.

## B.   Alleged Due Process Violations

Defendant Martinez contends that he is entitled to a new trial because the Court precluded the testimony of Cruz, Julio Torres ("Torres"), and Jean Carlos Rivera ("Rivera").  (Docket No. 170 at pp. 3-5.)

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right "to have compulsory process for obtaining witnesses in his favor."  U.S. Const. amend. VI.  "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. . . .  This right is a fundamental element of due process of law."  Washington v. Texas, 388 U.S. 14, 19 (1967). The defendant does not enjoy, however, "an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence."  Taylor v. Illinois, 484 U.S. 400, 410 (1988).

### 1.   Testimony of Cruz

After receiving the FBI report of investigation summarizing an interview conducted with Cruz, defendant Martinez subpoenaed Cruz to testify.  See Docket No. 151.  Martinez received a note from Cruz's doctor informing him that Cruz was bedridden and unable to testify until April 2016.  See id.  On the third day of trial, Martinez moved the court to admit the FBI report in lieu of Cruz's testimony.  See Docket No. 148.  The Court denied Martinez's motion, determining that the report did not contain Brady material. See id.  Martinez renewed his motion on the fourth day of trial,

and he also moved the Court to issue a material witness warrant against Cruz. (Docket No. 151.) The Court again denied Martinez's motion on the ground that the report did not contain <u>Brady</u> information. (Docket No. 154.)

Martinez now claims that his due process right to present a defense was violated when the Court did not issue a material witness warrant to compel Cruz's testimony. (Docket No. 170 at pp. 3-4.) Martinez proffers that, based on the FBI report, Cruz "would have presented an alternative theory of who committed the [robbery]" and would have "discredited the government theory that the [break-in] was through the [balcony] door." <u>Id.</u>

First, as discussed above, the FBI report does not indicate that Cruz had personal knowledge of who committed the robbery. <u>See</u> <u>supra</u> Part III. A. 1; Docket No. 170-1. To the contrary, the report indicates that Cruz told the FBI that a painter called the police to report that the robbery victim had accused him of the robbery. (Docket No. 170-1.) Defendant Martinez would not have been able to offer testimony "that the painter did it" through Cruz because that testimony would have been inadmissible double hearsay. <u>See</u> Fed. R. Evid. 802 (providing that hearsay is inadmissible unless an exception applies).

Second, and again as discussed above, whether and how the robbery actually took place is not of consequence to determining Martinez's guilt because he was charged with conspiring to interfere with constitutional rights, an offense that does not

require an overt act in furtherance of the conspiracy. See supra
Part III. A. 2; Crochiere, 129 F.3d at 234. Accordingly, testimony
on how the robbers entered the condominium would have been
inadmissible as irrelevant. See Fed. R. Evid. 402 (providing that
irrelevant evidence is inadmissible); id. 401 (providing that
evidence is relevant if "(a) it has any tendency to make a fact
more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action"). Even
if the evidence had some relevancy, it would have been cumulative
of Bellavista's identical testimony that he watched the security
camera video showing two individuals entering the condominium
through the front door. Thus, the Court would exclude it pursuant
to Federal Rule of Evidence 403 because any probative value of
Cruz's testimony would be "substantially outweighed" by "needlessly
presenting cumulative evidence." See Fed. R. Evid. 403.

Thus, defendant Martinez's due process rights were not
violated by not being able to present Cruz's testimony because her
testimony, as proffered by Martinez, would have been inadmissible
as hearsay, irrelevant, and cumulative.

### 2.   Testimony of Torres and Rivera

Defendant Martinez subpoenaed ATF agents Torres and
Rivera. Because Torres and Rivera are federal agents, Martinez
also sent a Touhy request to the ATF. The request indicated that
the agents' testimony would consist of Martinez's reputation within
the ATF and an investigation in which Martinez participated

concerning an ATF cooperator.  In light of the <u>Touhy</u> letter, the United States filed a motion *in limine* to limit Martinez's presentation of character evidence.  (Docket No. 75.)

On the fourth day of trial, outside the presence of the jury, defendant Martinez responded to the United States' motion *in limine* by informing the Court that Torres and Rivera would not testify as to Martinez's character or reputation.  Instead, Martinez explained, Torres and Rivera would testify that the reason Martinez called Sergeant Fernandez and Lopez in September 2010 was to investigate a cooperator pursuant to his official ATF duties. The United States objected that Torres and Rivera did not have personal knowledge of phone calls that Martinez made and that their testimonies would be irrelevant.

The Court heard the testimony of Torres and Rivera outside the presence of the jury.  They both testified that they had worked with defendant Martinez in September 2010 on an investigation of an ATF cooperator.  They testified that as part of the investigation, defendant Martinez made phone calls.  Neither witness was present when Martinez made the calls, nor did either witness know who Martinez called.

After hearing their testimony, the Court ruled that Torres and Rivera did not have information relevant to the case. The Court accordingly did not allow them to testify before the jury.

Martinez now claims that his due process right to present a defense was violated when the Court did not allow the testimony of Torres and Rivera.  (Docket No. 170 at pp. 4-5.)  Martinez argues that Torres and Rivera would have testified that Martinez contacted Sergeant Fernandez and Lopez in September 2010 as part of a valid, official ATF investigation of a cooperator.  Id.  Contrary to Martinez's argument, Torres and Rivera testified that they did not know who Martinez called in September 2010, nor were they present when any call was made.  Therefore, as proffered to the Court, the testimony of Torres and Rivera did not tend to make more or less probable the fact that Martinez called Sergeant Fernandez and Lopez in September 2010 to plan the conspiracy.  Thus, their testimony was irrelevant.  See Fed. R. Evid. 401, 402.

Defendant Martinez's due process rights were not violated when the Court refused to allow the irrelevant testimony of Torres and Rivera.

### 3.   Conclusion: No Due Process Violation

Consistent with the Court's rulings on the third and fourth days of trial, the proffered testimony of Cruz, Torres, and Rivera did not contain admissible evidence.  Accordingly, the Court **DENIES** defendant Martinez's motion for a new trial based on alleged due process violations.

## C.    Alleged Judicial Bias

Defendant Martinez contends that he is entitled to a new trial because the Court showed bias against him and his attorneys during the trial.  (Docket No. 170 at pp. 7-8.)

To prove a claim of judicial bias, the defendant must show that "(1) the court's intervention gave the appearance of bias and (2) the apparent bias seriously prejudiced him." United States v. Rivera-Rodriguez, 761 F.3d 105, 113 (1st Cir. 2014).  In this context, the United States Supreme Court has held that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases," are usually insufficient to prove judicial bias. Liteky v. United States, 510 U.S. 540, 555 (1994).  A "stern and short-tempered judge's ordinary efforts at courtroom administration," including "expressions of impatience, dissatisfaction, annoyance, and even anger," do not establish bias. Id. at 555-56.

Here, Martinez specifies three incidents of alleged judicial bias:  (1) when the Court "screamed" at defense counsel to show the Court a report, (2) when the Court advised a defense witness of his Fifth Amendment rights, and (3) when the Court told defense counsel to "go back to his books" during his argument for acquittal. (Docket No. 170 at pp. 7-9.)

### 1.   "Let me see the report."

The first incident occurred on the third day of trial while defense counsel was attempting to impeach FBI Agent Martha Yanez for alleged inaccuracies in her reports.  After defense counsel gave the agent a report to refresh her recollection on a matter, the Court, at sidebar, told counsel that he had to ask a question on the matter first before refreshing the agent's recollection.  Counsel asked the agent two questions, and then the following exchange took place:

BY MR. GONZALEZ-BOTHWELL:

Q.  Now, he also told you that he met with -- that Pedro and him met with Mr. Francisco Martinez at an Econo by the airport.

A.  Did he say Econo in that report?  I believe it said grocery store.

THE COURT:  Let me see the report.

THE WITNESS:  Is that a different report?

THE COURT:  Let me see the report.

MR. GONZALEZ-BOTHWELL:  Moment, Your Honor.

THE COURT:  No.  No.  Right now.  Let me see the report. Let me see the report.

MR. GONZALEZ-BOTHWELL:  Your Honor --

THE COURT:  Let me see the report.  Approach the bench.

(Tr. of Trial on Feb. 24, 2016, p. 71.)  The Court ordered defense counsel to bring it the report five times before counsel complied. Even though this was in the presence of the jury, the Court's "expressions of impatience, dissatisfaction, annoyance, and even

anger" did not cross the line of showing bias against defendant Martinez.  See Liteky, 510 U.S. at 555-56; accord United States v. Rodriguez-Rivera, 473 F.3d 21, 28-29 (1st Cir. 2007) (finding no judicial bias where judge, inter alia, "took an arguably harsh tone," reprimanded defense counsel, and "showed exasperation with defense counsel in front of the jury from time to time").

Furthermore, in an abundance of caution, the Court read the following instruction to the jury on the fifth day of trial, after the close of defendant's evidence:

> It is sometimes the duty of the Court to admonish or warn an attorney who out of zeal for the cause of his client does something which is not in keeping with the rules of evidence or procedure.
>
> Do not permit this to have any effect on your evaluation of the merits of any evidence that comes before you.
>
> You are to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial of this case.

(Tr. of Trial on Feb. 26, 2016, pp. 32-33.)  The First Circuit Court of Appeals has held that an instruction like this "usually mitigates any perceived partiality from the bench." Rodriguez-Rivera, 473 F.3d at 28-29; accord United States v. Ayala-Vazquez, 751 F.3d 1, 26 (1st Cir. 2014) ("[W]ithin wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions." (internal quotation marks and citations omitted)).

Thus, the Court did not give the appearance of bias when it showed impatience and raised its voice at defense counsel for repeatedly not following the Court's order.  Any bias that may have been perceived was mitigated by a curative instruction to the jury.

### 2.   Advising Defense Witness of His Rights

The second incident of alleged judicial bias occurred when defendant Martinez called Sergeant Fernandez to the stand. Unlike Lopez and Ramos, Sergeant Fernandez was not testifying pursuant to a plea and cooperation agreement that he had reached with the advice of counsel.  Outside the presence of the jury, the United States requested that Sergeant Fernandez be read his Fifth Amendment rights because the United States "intend[ed] to go into credibility matters."  Martinez objected, arguing that reading Sergeant Fernandez his rights would amount to "intimidation."  The Court overruled Martinez's objection and read Sergeant Fernandez his rights outside the presence of the jury.  That exchange occurred as follows:

THE COURT: Sir, what is your name?

THE WITNESS: Jorge Fernandez-Aviles.

THE COURT: Sir, before you testify, I have to read you your rights.  You have the right to remain silent. Anything you say can and will be used against you in a court of law.  You have a right to talk to a lawyer before you testify and have him present here while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.  You can decide at any time to exercise these rights and not answer any questions or make any statements.  Do you want a lawyer?

THE WITNESS: Right now, I don't.

THE COURT: Do you understand all of the rights that I have explained to you?

THE WITNESS: Yes, sir.

THE COURT: Having those rights in mind, do you wish to testify?

THE WITNESS: Yes, sir.

(Tr. of Trial on Feb. 25, 2016, pp. 34-35.)  Sergeant Fernandez then testified for Martinez.

A district court has the discretion "to make sure a witness understands her Fifth Amendment rights." United States v. Santiago-Becerril, 130 F.3d 11, 26 (1st Cir. 1997).  A court abuses that discretion when it "actively encourages a witness not to testify or badgers a witness into remaining silent." United States v. Arthur, 949 F.2d 211, 216 (6th Cir. 1991) (finding court abused its discretion when it induced defense witness to stop testifying by repeatedly informing witness of his right to remain silent and telling him "that to testify was against his interest"); see Webb v. Texas, 409 U.S. 95, 95-98 (1972) (holding that defendant was deprived of his due process rights when sole defense witness refused to testify after trial judge gave witness a "lengthy and intimidating warning" that judge would "personally see" that witness would be indicted for perjury if witness lied under oath); cf. Santiago-Becerril, 130 F.3d at 23-26 (finding no impropriety in judge's conduct where defense witness decided not testify after

judge advised witness of her rights in a "relatively detailed and strongly stated" manner and provided witness with access to public defender, but where judge was "careful to emphasize that the witness could testify if she wished").

Here, unlike the trial courts in <u>Webb</u> and <u>Arthur</u>, the Court did not badger or intimidate Sergeant Fernandez by repeatedly advising him of his rights, telling him that it was against his interest to testify, or using strong language. <u>See</u> 409 U.S. at 95-98; 949 F.2d at 215-16.   To the contrary, the Court advised Sergeant Fernandez of his rights in very plain terms and outside the presence of the jury.   Fernandez then testified fully for defendant Martinez, and he invoked his right to remain silent only during parts of the United States' cross-examination.   Martinez fails to explain how the Court's advising Fernandez of his rights resulted in intimidation.

Thus, the Court acted properly by advising Sergeant Fernandez of his rights before he testified, and no intimidation or bias resulted.

**3.    "You better go back to your books."**

The third incident of alleged judicial bias occurred outside the presence of the jury while defense counsel argued for a judgment of acquittal after the close of the United States' evidence.   After counsel repeatedly made the same unpersuasive and flawed argument concerning the "under color of law" issue, the

Court told defense counsel, "You better go back to your books." (Tr. of Trial on Feb. 24, 2016, p. 51.)

The Court's expression of "impatience, dissatisfaction, [and] annoyance" with defense counsel and his flawed legal argument did not cross the line of showing bias against defendant Martinez. See Liteky, 510 U.S. at 555-56; United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008) (finding no judicial bias where judge, inter alia, told counsel to "shut up" during sidebar conference and made "demeaning comments" about counsel's performance).

Furthermore, because the comment was made outside the presence of the jury, there is little concern of prejudicial bias. See United States v. Lanza-Vazquez, 799 F.3d 134, 144 (1st Cir. 2015) ("Since our focus centers on whether the statements affected the jury (or whether they are so egregious on their own as to demand significant scrutiny — which was not the case here) statements that occur outside of the jury's presence are generally kosher."); Rivera-Rodriguez, 761 F.3d at 111 (emphasizing that the focus of the inquiry is whether jury perceived bias).

### 4.    Conclusion: No Judicial Bias

The three incidents highlighted by defendant Martinez not only do not show judicial bias, they also did not result in "serious prejudice."  See id. at 112 (holding that "the defendant retains the burden of demonstrating serious prejudice").  Improper judicial intervention seriously prejudices a defendant if "there is a reasonable probability that, but for the error, the verdict would

have been different." Id. at 112.  Here, there was ample evidence to convict defendant Martinez.  Two co-conspirators tied Martinez directly to the conspiracy and explained in detail his role in planning and executing the robbery.  Extensive phone records corroborated the co-conspirators' accounts, as did historical cell site data.

Accordingly, the Court **DENIES** defendant Martinez's motion for a new trial based on the alleged judicial bias.

### IV.   CONCLUSION

For the reasons discussed above, the Court **DENIES** defendant Martinez's motion for a judgment of acquittal, (Docket No. 171), and **DENIES** his motion for a new trial, (Docket No. 170).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 17, 2016.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE