# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff**,

         **v.**                      **Criminal No.** 15-576 (FAB)

FRANCISCO MARTINEZ-MERCADO,

    **Defendant.**

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Francisco Martinez-Mercado's ("Martinez") motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"). (Docket No. 210.) For the reasons set forth below, the motion for a new trial is **DENIED**.

## I.   FACTUAL BACKGROUND

On February 26, 2016, after a five-day trial, a jury found defendant Martinez guilty of conspiring to injure, oppress, threaten, or intimidate a person in the enjoyment of that person's constitutional right to be free from unreasonable searches and seizures in violation of 18 U.S.C. section 241 ("section 241"). (Docket No. 197.) The Court summarizes the pertinent facts in the light most compatible with the jury's verdict and in a manner consistent with the trial record. See United States v. Valerio,

676 F.3d 237, 240 (1st Cir. 2012); United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011).

In September 2010, defendant Martinez was a Task Force Officer for the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). He had previously worked in the Drugs Division of the Puerto Rico Police Department ("PRPD"), under the supervision of Sergeant Jorge Fernandez-Aviles ("Fernandez-Aviles"). On September 15, 2010, defendant Martinez called Fernandez-Aviles to inquire about a "job" in Carolina. Fernandez-Aviles had a reputation for being corrupt, and corrupt officers referred to criminal activities as "jobs."

After discussing the prospect of a "job" in Carolina with defendant Martinez, Fernandez-Aviles called Pedro Lopez-Torres ("Lopez-Torres"), a PRPD officer whom Fernandez-Aviles had once supervised, and who worked in the Criminal Investigations Unit in Carolina as of September 2010. Fernandez-Aviles and Lopez-Torres had performed "jobs" together in the past. Fernandez-Aviles told Lopez-Torres that an ATF task force officer named Martinez needed assistance in completing a "job" in Carolina. After Fernandez-Aviles assured Lopez-Torres that he had completed "jobs" with defendant Martinez, Lopez-Torres urged Fernandez-Aviles to share his phone number with defendant Martinez.

Defendant Martinez called Lopez-Torres within minutes of receiving his phone number on September 15, 2010. Lopez-Torres asked defendant Martinez to meet in person because corrupt officers never discussed "jobs" over the phone. Later that same day, Lopez-Torres called Luis Ramos-Figueroa ("Ramos-Figueroa"), a PRPD officer whom Lopez-Torres trusted. Lopez-Torres and Ramos-Figueroa met in person, and Lopez-Torres persuaded Ramos-Figueroa that defendant Martinez was trustworthy. Ramos-Figueroa agreed to participate in the "job."

In the intervening days, defendant Martinez and Lopez-Torres met in person to discuss the "job." Defendant Martinez disclosed that he commissioned "*títeres*," or thugs, to burglarize a condominium belonging to an individual whom the ATF had recently arrested. The thugs would steal money, jewelry, and drugs from the apartment. Defendant Martinez asked Lopez-Torres to assist in the burglary. Lopez-Torres offered to provide security.

Lopez-Torres informed defendant Martinez that the "job" had to occur during Lopez-Torres's work schedule, specifically Monday through Friday from 4:00 p.m. to midnight. Lopez-Torres explained to defendant Martinez that he would sit in his patrol car near the condominium during the burglary, impressing upon the public that the area was safe. He also offered to monitor the police radio for complaints regarding the burglary. If the dispatcher reported

a complaint, Lopez-Torres would alert the burglars inside the condominium so that they could escape without detection. Lopez-Torres further explained that his official duties included investigating home invasions and thefts. As a police officer, Lopez-Torres would investigate any case pertaining to the burglary, permitting him to obstruct potential investigations. After meeting with defendant Martinez in person, Lopez-Torres met with Ramos-Figueroa to discuss the "job."

On September 23, 2010, defendant Martinez notified Lopez-Torres that the burglary would occur that evening. Lopez-Torres called Ramos-Figueroa to relay the information. Lopez-Torres began his shift at 4:00 p.m. At approximately 7:00 p.m., Lopez-Torres drove his patrol car to the parking lot of a Pueblo supermarket to meet defendant Martinez. Defendant Martinez drove a minivan. Lopez-Torres observed the silhouettes of unidentified individuals seated inside defendant Martinez's minivan.

Ramos-Figueroa arrived at the Pueblo parking lot and joined Lopez-Torres in his patrol car. Defendant Martinez then signaled to Lopez-Torres and Ramos-Figueroa to exit the parking lot. Lopez-Torres and Ramos-Figueroa followed defendant Martinez to the PlayaMar Condominium ("PlayaMar"). Martinez turned into the PlayaMar's parking area, and Lopez-Torres and Ramos-Figueroa continued to the end of the street, where Lopez-Torres parked the

patrol car. A number of individuals exited the minivan and entered the PlayaMar. Lopez-Torres and Ramos-Figueroa remained near the PlayaMar, listening to the police radio.

Shortly after the burglary, defendant Martinez and Lopez-Torres spoke on the phone. Defendant Martinez told Lopez-Torres that the "job" went well, and that they would reconvene at the Pueblo supermarket parking lot in 30 to 45 minutes. They met in the parking lot as planned, and defendant Martinez handed Lopez-Torres two stacks of money. Each stack contained $1,200 to $1,500. Lopez-Torres handed one stack to Ramos-Figueroa and kept the other for himself. Lopez-Torres asked defendant Martinez for Fernandez-Aviles' cut. Defendant Martinez explained that there was not that much, only about $6,000 to $7,000 and some jewelry, and that he would coordinate with Fernandez-Aviles regarding his share of the proceeds.

Defendant Martinez spoke with Lopez-Torres on the phone during the next week. Lopez-Torres warned defendant Martinez that an individual had filed a complaint the morning after the burglary. Lopez-Torres, however, refrained from interfering with investigation because the complaint was received when Lopez-Torres was off-duty and inquiring into the burglary might have raised suspicions.

The jury ultimately found defendant Martinez guilty of violating section 241 on February 12, 2016. (Docket No. 167.) Martinez received a sentence of 87 months of imprisonment. (Docket No. 197.) Within a month of the verdict, Martinez moved for a new trial pursuant to Rule 33 and Brady v. Maryland, 373 U.S. 83 (1963). (Docket No. 170.) According to Martinez, the government withheld exculpatory and impeachment evidence. (Docket No. 170.) The Court, however, denied the motion for a new trial because the evidence in dispute constituted sheer speculation, was cumulative, and concerned collateral matters. United States v. Martinez-Mercado, Case No. 15-576 (FAB), 2016 U.S. LEXIS 81129, at * 14-15 (D.P.R. June 17, 2016) (Besosa, J.). Defendant Martinez premises this second motion for a new trial on newly discovered evidence, namely, statements from inmates at the Metropolitan Detention Center ("MDC") suggesting that Lopez-Torres and Ramos-Figueroa provided perjured testimony during defendant Martinez's trial. (Docket No. 210.)

## II.  RULE 33 LEGAL STANDARD

A trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant may base his or her motion for a new trial on newly discovered evidence or on other grounds, but "[t]he remedy of a new trial must be used sparingly and only where a miscarriage of

justice would otherwise result." Fed. R. Crim. P. 33(b); United

States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009) (internal

citation and quotation marks omitted).   A four prong test first

articulated by the First Circuit Court of Appeals in United States

v. Wright, 625 F.2d 1017 (1st Cir. 1980), remains the standard by

which courts analyze newly discovered evidence in the context of

a Rule 33 motion.   United States v. Rodriguez-Marrero, 390 F.3d 1,

14 (1st Cir. 2004).   A motion for a new trial based on newly

discovered evidence will ordinarily fail unless the moving party

demonstrates that:

> (1) the evidence was unknown or unavailable to the
> defendant at the time of trial; (2) failure to learn of
> the evidence was not due to lack of diligence by the
> defendant; (3) the evidence is material, and not merely
> cumulative or impeaching; and (4) it will probably
> result in an acquittal upon retrial of the defendant.[1]

---

[1] Defendant Martinez relies exclusively on evidence that the government obtained
after his trial.  Absent from his motion for a new trial are allegations that
the government knowingly elicited perjured testimony. The Court, thus, need not
consider whether there were any possible Brady violations.   See Gonzalez-
Gonzalez, 258 F.3d at 21 ("Brady error rule should apply to claims for knowing
use of perjured testimony").  The First Circuit Court of Appeals held that the
"the court's choice among the standards for analyzing new trial motions depends
upon the ground for the new trial motion." Id.   To obtain a new trial when the
government knowingly introduced perjured testimony, defendants need only show
a **reasonable** likelihood that the false testimony could have affected the
judgment of the jury."   Id. at 22 (emphasis added).   When the government
unwittingly relied on perjured testimony as defendant Martinez alleges, a higher
standard is applicable.   Defendant Martinez must demonstrate that the new
evidence "in **actual** probability would result in acquittal if a new trial were
granted." Id. at 21 (emphasis added); United States v. Josleyn, 206 F.3d 144,
152 (1st Cir. 2000) ("The standard applied to new trial motions based on Brady
violations is more favorable to defendants" than the traditional Wright
standard).  Accordingly, the Court employs the heightened "actual probability"
standard in deciding the merits of defendant Martinez's motion.

United States v. Pereira, 51 F. Supp.3d 203, 210 (D.P.R. 2014)

(Besosa, J.) (citing Wright, 625 F.2d at 1019).  The defendant

must satisfy all four prongs to prevail on a Rule 33 motion.

United States v. Colon-Muñoz, 318 F.3d 348, 360 (1st Cir. 2003)..

Failure to satisfy just one Wright factor defeats a Rule 33 motion

in toto.  United States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st

Cir. 2001).

Wright and its progeny impose an onerous burden on convicted

defendants.  A new trial is justified only when introduction of

the additional evidence "will probably result in an acquittal,"

meaning "an actual probability that an acquittal would have

resulted if the evidence had been available."  United States v.

Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993).[2]  The Court examines

newly discovered evidence within the context of the "record as a

---

[2]Motions for a new trial are routinely denied and are hardly ever granted.  See, United States v. Connolly, 504 F.3d 206, 217 ("the jailhouse recantation, even if it occurred, did not require the granting of a new trial"); Marrero, 390 F.3d at 30 ("Having presided at the lengthy trial of Genao and his co-defendants, and having heard the testimony of the co-conspirators produced at the hearing on the motion for a new trial, the district court did not remotely abuse its discretion in rejecting the arguments that the testimony from Genao's co-conspirators `will probably result in an acquittal upon retrial.'"); United States v. Colon-Muñoz, 318 F.3d  at 360-61 ("Rule 33 motion fails the third prong of the Wright standard" because witness's "revised sworn statement was an attempt to impeach his own trial testimony"); United States v. Josleyn, 206 F.3d 144, 160 (affirming denial of Rule 33 motion because the "outcome would undoubtedly be the same"); United States v. Huddleston, 194 F.3d 214, 221 (1st Cir. 1999) (despite newly discovered impeachment evidence, "the jury had ample evidence of the appellant's guilt"); United States v. Natanel, 938 F.2d 302, 314 (1st Cir. 1991) (upholding denial of Rule 33 motion because "adding this evidence to the trial mix would not "probably result in an acquittal upon retrial of the defendant'").

whole, not on the basis of wishful thinking, rank conjecture, or unsupportable surmise." <u>Natanel</u>, 938 F.2d at 314; <u>Josleyn</u>, 206 F.3d at 157 (Rule 33 analysis is based on "an evaluation of the new evidence in juxtaposition to the evidence actually admitted at trial."). Newly discovered evidence that is merely impeaching ordinarily cannot form the basis for a new trial. <u>Colon-Munoz</u>, 318 F.3d at 361.

Ultimately, Rule 33 motions predicated on newly discovered evidence require the trial court to make a "judgment call." <u>United States v. Connolly</u>, 504 F.3d 206, 211 (1st Cir. 2007). In this Court's judgment, defendant Martinez fails to overcome the third and fourth prongs of the <u>Wright</u> analysis.

## III. EVIDENCE AT TRIAL

Martinez presents three post-verdict interviews in support of his motion for a new trial. Before addressing the interviews, however, the Court summarizes the evidence on which the jury found defendant Martinez guilty.

A.    **The Government's Case in Chief**

The evidence offered against defendant Martinez included testimony from co-conspirators Lopez-Torres and Ramos-Figueroa.[3] At trial, both Lopez-Torres and Ramos-Figueroa testified that they served as uniformed lookouts during the burglary. Lopez-Torres and Ramos-Figueroa stated that after reporting to work on September 23, 2010, both men sat inside a parked PRPD patrol car while unidentified individuals burglarized an apartment at the behest of defendant Martinez. According to Lopez-Torres, he served as a lookout to "provide security to [defendant Martinez], also communication, meaning that with the radio [he] could see if any complaint was going to come in the area regarding the home invasion." (Docket No. 204 at p. 112. Ramos-Figueroa, for his part, testified that he joined Lopez-Torres in the patrol car "because no citizen [would] think that a crime [was] being

---

[3] During the Rule 29 hearing, the Court ruled that the United States had proven the existence of a conspiracy by a preponderance of the evidence. Docket No. 204 at p. 63; <u>United States v. Petrozziello</u>, 548 F.2d 20, 23 (1st Cir. 1977) (co-conspirator statements are not hearsay when the trial judge finds it more likely than not that the defendant was a co-conspirator of the declarant, that the conspiracy existed at the time the statement was made, and that the statements were made in furtherance of the conspiracy). Moreover, the Court admitted into evidence the statements of co-conspirators, reasoning that "[w]itnesses Torres-Lopez and Ramos-Velez [*sic*] were members of a conspiracy, which also included other members. The declarations of those witnesses, conspirators, as to the statements of Defendant Francisco Martinez-Mercado and as to the statements of any other member of the conspiracy were made during the course of and while they were members of and in furtherance of the conspiracy, and hence authorized and admissible pursuant to Federal Rule of Evidence 801(d)(2)(E)." (Docket No. 204 at pp. 63-64.)

committed when [the patrol car] is around." (Docket No. 203 at p. 132.)   Both Lopez-Torres and Ramos-Figueroa testified that defendant Martinez paid them between $1,200 and $1,500 for their role in the burglary.

In addition to testimony from Lopez-Torres and Ramos-Figueroa, the government presented ample circumstantial evidence of defendant Martinez's guilt.[4]  After the burglary, an ATF agent recovered a disposable, pre-paid phone from defendant Martinez's work-issued vehicle.   This disposable phone contained contact information for just one person: Pedro Lopez-Torres.  (Docket No. 203 at p. 34.)   FBI special agent Marta Yanez ("Yanez") stated that the disposable phone recovered from defendant Martinez's vehicle called the phone belonging to Lopez-Torres on September 15 and 16, just days before the burglary.  Id. at p. 36.

Agent Yanez further testified that on several occasions defendant Martinez stated that "he was scared of Blondet," the occupant of the burglarized apartment and a known drug dealer. (Docket No. 203 at p. 39.)   ATF task force agent Nelson Sotelo

---

[4] To obtain a guilty verdict, the government need not present direct evidence of an alleged crime.  A guilty verdict may rest on circumstantial evidence alone See United States v. Batista Polanco, 927 F.2d 12, 18 (1st Cir. 1991) ("Although wholly circumstantial, the evidence was sufficient to support appellant's conviction on each count."); United States v. Melendez-Torres, 420 F.3d 45, 49 (1st Cir. 2005) ("[C]ircumstantial evidence, if it meets all other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the [fact finder] deems it should be given.") (citation omitted).

("Sotelo") testified that defendant Martinez said he knew Luis
Blondet-Martinez ("Blondet") from school, and that Blondet owned
a drug point.  Id. at p. 23.

        Moreover, Josue Cosme-Rosa ("Cosme-Rosa"), a PRPD crime
scene technician, described the condition of Blondet's apartment
the morning after the burglary.    Id. at p. 46.  Officer Cosme-
Rosa observed personal belongings thrown about the floor, cabinet
drawers left opened, and damage to furniture.  Id. at pp. 46 – 48.
The disarray inside the apartment had the "characteristics of a
scene that something – of something that had happened in there."
Id. at p. 47.

        The   government   culminated   its   case-in-chief   with
testimony from Jennifer Banks ("Banks"), a supervisor for the FBI's
Cellular  Analysis  Survey  Team.   Agent  Banks  examined  the  call
records  for  the  cellular  phones  belonging  to  defendant  Martinez
and Lopez-Torres for the night of September 23, 2010, that is, the
night of the burglary.  (Docket No. 204 at p. 21.)  She placed the
phones belonging to defendant Martinez and Lopez-Torres within the
immediate  area  of  the  PlayaMar  condominium.    Id. at pp. 29-33.
Call  records  showed  that  between  7:00  p.m.  and  11:00  p.m.  of
September 23, 2010, 19 calls were made between defendant Martinez
and Lopez-Torres. Id. at p. 33.  Based on tower signals, Banks
concluded  that  the  phones  traveled  along  the  same  geographical

route.  The phones belonging to Lopez-Torres and defendant Martinez

"had very similar activity and use of different antennas"

positioned throughout Carolina and Isla Verde.  Id. at p. 36.

Banks refrained from speculating whether defendant Martinez and

Lopez-Torres were within arms-length of each other, or whether

they rode in the same vehicle.  She could, however, conclude that

their phones "were both following a similar pattern" from one

cellular tower to the next.[5]  Id. at p. 37.

### B.   Defendant Martinez Presented Evidence at Trial

Defendant Martinez offered an alternative explanation

for his communications with Lopez-Torres: that defendant Martinez

contacted Lopez-Torres to investigate police corruption in his

capacity as an ATF task force officer.

Fernandez-Aviles testified as a witness for the defense.

He claimed that defendant Martinez contacted him in 2010 to

"request the cooperation for the investigation of a person," not

to recruit fellow police officers to assist in a criminal venture.

(Docket No. 205 at p. 38.)  Fernandez-Aviles placed defendant

Martinez in contact with Lopez-Torres because Lopez-Torres "had

been already working for a while in Carolina, and he would be able

to help him in whatever he requested."  Id. at p. 39.  Fernandez-

---

[5] Lopez-Torres testified on cross-examination that he stopped receiving phone calls from defendant Martinez after November 2010.  (Docket No. 202 at p. 142.)

Aviles denied unequivocally that he referred Lopez-Torres to defendant Martinez so that the two officers could engage in an illegal scheme. Id.

The defense then called PRPD police officer Jose Bellavista-Ruiz ("Bellavista-Ruiz"), who initially investigated the burglary. Officer Bellavista-Ruiz testified that he recovered surveillance footage from the PlayaMar corresponding to the time of the burglary. Id. at p. 59. The footage showed two individuals wearing hooded jackets exit the elevator, force the apartment door open, enter the apartment, and leave using the same route. Id. at p. 61. Officer Bellavista-Ruiz could not identify the two individuals from the surveillance footage. Id. According to Officer Bellavista-Ruiz, Lopez-Torres asked him if he responded to a complaint in the area. Id. at p. 63. PRPD fingerprints technician Jose Gonzalez-Ortiz testified that the only fingerprints recovered from the apartment belonged to Blondet. Id. at p. 79.

The Resident Agent in Charge for the ATF, Julio Torres ("Torres"), testified that defendant Martinez once worked under his supervision. (Docket No. 205 at p. 20.) Agent Torres instructed defendant Martinez to investigate an ATF cooperator who authorities suspected of colluding with suspected criminals. Id. Defendant Martinez was responsible for verifying that the

cooperator had refrained from engaging in criminal activities. Id.

### C.    Newly Discovered Evidence

On December 16, 2016, the government disclosed to defendant Martinez FBI 302 reports that summarized information provided by federal inmates Arnaldo Lopez-Ortiz ("Lopez-Ortiz") and Osvaldo Vazquez-Ruiz ("Vazquez-Ruiz"). Following this disclosure, defense counsel conducted a telephone interview with a Nadab Arroyo-Rosa ("Arroyo-Rosa"), also an inmate. The 302 reports and telephone interview of Arroyo-Rosa form the basis of Martinez's request for a new trial pursuant to Rule 33.

FBI special agents and two Assistant United States Attorneys interviewed Lopez-Ortiz on October 20, 2016. (Docket No. 210 at p. 2.) Like defendant Martinez, Lopez-Ortiz is a former PRPD police officer. Id. According to Lopez-Ortiz, he engaged in a conversation with Osvaldo Vazquez-Ruiz ("Vazquez-Ruiz") and Arroyo-Rosa, two fellow inmates at MDC. Id. Lopez-Ortiz claimed that Vazquez-Ruiz and Arroyo-Rosa told Lopez-Ortiz that they overheard Lopez-Torres and Ramos-Figueroa, both witnesses at defendant Martinez's trial, talk about "getting a story straight." (Docket No. 210-1 at p. 1.) Lopez-Torres and Ramos-Figueroa allegedly agreed that they "were going to say they were together at a particular place and time," and that "[Lopez-Torres] and

[Ramos-Figueroa] were concerned that if there was a camera at that particular place, the camera would show they were not there as they were going to claim." Id.

Subsequently, the same FBI special agents and Assistant United States Attorneys interviewed Vazquez-Ruiz, the source of Lopez-Ortiz's disclosures from the first interview. (Docket No. 210-212.) Vazquez-Ruiz alleged that he heard a private conversation between Lopez-Torres and Ramos-Figueroa. Id. at p. 1. Vazquez-Ruiz **presumed** that the conversation concerned testimony that Lopez-Torres and Ramos-Figueroa intended to provide in an upcoming case. Id. (emphasis added). Vazquez-Ruiz allegedly heard Lopez-Torres and Ramos-Figueroa refer to a firearm. Id. Lopez-Torres told Ramos-Figueroa that Lopez-Torres withheld information from prosecutors, or in a slang expression, "*no habia soltado la sopa completa*." Id. According to Vazquez-Ruiz, Ramos-Figueroa warned Lopez-Torres that if Ramos-Figueroa claimed he "picked up [Lopez-Torres] at a particular place (unknown to Vazquez-Ruiz) and there were cameras at that place, the cameras would show they were not there." Id. at pp. 1-2.

Defense counsel conducted a telephone interview of Arroyo-Rosa following receipt of the 302 reports. (Docket No. 210 at p. 3.) According to Arroyo-Rosa, "Lopez-Torres and Ramos-

Figueroa discussed concocting false and fraudulent testimony on one or more occasions." Id.

## IV.  DISCUSSION

The Court concurs with defendant Martinez and the government that the first two prongs of the Wright standard are satisfied: the interviews with Lopez-Ortiz, Vazquez-Ruiz and Arroyo-Rosa were unavailable to defendant Martinez at the time of trial, and failure to learn of this evidence cannot be attributed to a lack of due diligence.[6]  (Docket No. 210 at p. 4; Docket No. 224 at p. 11.) Consequently, the Court will address whether the newly discovered evidence proffered by defendant Martinez "is material, not merely cumulative or impeaching, and [whether] its availability is likely to bring about an acquittal upon retrial." United States v Connolly, 504 F.3d at 212 (citing Wright, 625 F.2d 1017 (1st Cir. 1980)).

### A.  Materiality

A showing of materiality is necessary to prevail on a Rule 33 motion.  Wright, 625 F.2d 1017, 1019 (1st Cir. 1980).  New evidence is material when it possesses the potential to "alter the outcome of the lawsuit under the applicable legal tenets." United

---

[6] Perjury committed by witnesses during trial is considered newly discovered evidence for purposes of a Rule 33 motion.  See Huddleston, 194 F.3d at 220 ("In short, we fail to see any substantial justification for treating the discovery of perjury differently than other newly discovered evidence.").

States v. Hernandez-Rodriguez, 443 F.3d 138, 145 (1st Cir. 2006)
(adopting the materiality standard used in the summary judgment
context to evaluate Rule 33 motions). The interviews, defendant
Martinez argues, are material because they establish that Lopez-
Torres and Ramos-Figueroa testified falsely at trial and misled
the government. (Docket No. 210 at pp. 4-11.) The Court
disagrees. The substance of the interviews, as summarized in the
FBI 302 reports, merely calls into question the candor of Lopez-
Torres and Ramos-Figueroa, something defendant Martinez already
did quite impressively during the course of the trial.
Accordingly, the substance of the FBI 302 reports is merely
impeaching and cumulative of evidence of Lopez-Torres and Ramos-
Figueroa's general lack of trustworthiness.

        Defendant Martinez submits this proposition: "The real
crux of the '302' Reports is the indication that Lopez-Torres and
Ramos-Figueroa did not meet with [defendant] Martinez anywhere,
and that he was not involved in whatever scheme or burglary they
had organized." Id. at p. 5. Defendant Martinez concludes,
without explanation, that because Lopez-Torres and Ramos-Torres
purportedly perjured themselves, defendant Martinez had no role in
the burglary. The Court rejects this proposition because it fails
to grasp how the evidence contained in the 302 reports would tilt
the balance in persuading the jury not to believe Lopez-Torres and

Ramos-Figueroa's respective accounts of defendant Martinez's participation in the offense, particularly in light of the evidence already put before the jury suggesting that Lopez-Torres and Ramos-Figueroa are unworthy of trust.

Furthermore, defendant Martinez first emphasizes that the trial testimony offered by Lopez-Torres and Ramos-Figueroa differed from the information they provided during their debriefings with law enforcement officials. <u>Id.</u> at p. 6. For instance, Lopez-Torres and Ramos-Figueroa claimed at trial that they met defendant Martinez at a Pueblo supermarket. (Docket No. 202 at p. 115; Docket No. 203 at p. 131.) Prior to trial, however, Lopez-Torres and Ramos-Figueroa indicated that the meeting occurred at a Denny's restaurant, not a supermarket. (Docket No. 210 at p. 7.) Additionally, Ramos-Figueroa initially informed law enforcement officials that defendant Martinez drove a Cadillac with three to four other individuals. <u>Id.</u> Despite this assertion, at trial Ramos-Figueroa denied having said that the vehicle was a Cadillac and confirmed that "several individuals," not three or four people specifically, accompanied defendant Martinez. (Docket No. 203 at p. 132.)

The inconsistencies between Lopez-Torres and Ramos-Figueroa's pre-trial and trial statements are not newly discovered evidence, are thus not directly pertinent to the Court's analysis.

See United States v. McCurdy, 828 F. Supp. 2d 335, 356 (D. Me. 2011) ("Information that defense counsel, for whatever reason, 'decides not to pursue [. . .] as part of his trial strategy' does not constitute 'newly discovered' evidence for purposes of Rule 33(a).") (citation omitted). The trial testimony and statements during debriefings with law enforcement do not constitute newly discovered evidence and are independent of the interviews that occurred months after the guilty verdict.

Indeed, the "real crux of the 302 reports" is that the statements on which defendant Martinez's premises his request for a new trial would provide, at most, additional ammunition to an already impressive arsenal of impeachment material. (Docket No. 210 at p. 5.) Accusations of perjury are merely cumulative when offered to weaken the credibility of witnesses already subject to extensive cross-examination. See Connolly, 504 F.3d at 217 (affirming denial of new trial because "[g]iven [the witness's] extensive criminal history, it would not have been an abuse of discretion for the district court to find that the absence of additional cross-examination on essentially the same well-developed theme would not undermine the confidence in the jury's verdict") (citation omitted). There is no doubt that Lopez-Torres and Ramos-Figueroa were subject to extensive cross-examination in this case. During the course of the cross-examination of Lopez-

Torres, the jury learned that: (1) he negotiated a plea agreement
with the government; (2) he faced a possible 14-year sentence, but
received a mere four-year sentence; (3) his plea agreement hinged
on his continued cooperation with the government, which included
testifying in court; (4) Lopez-Torres was a serial law-breaker,
and had committed crimes for which he had not been charged; and
(5) Lopez-Torres had previously lied to the FBI.  Id. at p. 152.

        By way of example, defense counsel uncovered potential
bias by eliciting information about Torres-Lopez's cooperation
with government:

> Defense Counsel: And isn't it true that when you decided
> to join and accept the government's offers to cooperate,
> the more information you could provide them on anything
> illegal, the more benefit you could derive; isn't that
> correct?
>
> Lopez-Torres:  No.
>
> Defense Counsel:  No, you would not derive benefits by
> providing them information on crimes or corrupt police
> officers?
>
> Lopez-Torres:  If you let me explain.
>
> The Court:  Go ahead.
>
> Lopez Torres:  At the time that I decided to cooperate,
> I was being investigated only for one fact, which was
> the robbery that occurred in 2012 in Bayamón on July 14.
> When the agents approached me, I make the decision to
> cooperate.

(Docket No. 202 at p. 144.)

Lopez-Torres all but admitted that the plea agreement was the "reason [he was] testifying here today." Id. at p. 152. Defense counsel summarized Lopez-Torres's testimony by asking:

> Defense Counsel: You have testified as to multiple times that you broke the law, and it was not until you got caught that you decided to do what's best for you. And then you started cooperating; is that correct?
>
> Lopez-Torres: If you let me explain, I can answer.
>
> The Court: Go ahead.
>
> Lopez-Torres: Yes, at this time I am like this, because when I was summoned, I already had done a lot of harm. And I believe that it was – what was the correct thing to do, the right thing to do was to confess everything, all the bad things that I had done.

Id. at p. 202.

Indeed, the jury was made well aware of all the reasons Lopez-Torres had to lie. The burglary at the PlayaMar was not an isolated event. Defense counsel's cross-examination portrayed Lopez-Torres as a corrupt police officer who participated in criminal activities on numerous occasions, some of which Lopez-Torres refused to disclose because he didn't "have immunity on that, and I could be charged for those crimes." Id. at p. 145. Defense counsel attempted to diminish Lopez-Torres' character for truthfulness by asking him directly whether he lied to the FBI regarding Fernandez-Aviles' involvement in another crime. Id. at p. 155. Lopez-Torres answered unequivocally that "yes," he lied to the FBI. Id.

Ramos-Figueroa was similarly portrayed as a corrupt former police officer and convicted felon whose testimony should be considered cautiously. For instance, Ramos-Figueroa informed the jury that he "pled guilty to robbery, weapons, drugs and violation of civil rights." (Docket No. 203 at p. 117.) Because of his cooperation with the government, Ramos-Figueroa received a 48-month sentence in connection with these crimes, less than one-third the time he faced prior to the plea agreement. Id. at p. 120. The jury further learned that Ramos-Figueroa, like Lopez-Torres, was a serial law-breaker who had committed crimes for which he had not been charged. Those crimes included making false statements as a police officer, lying to prosecutors, providing perjured testimony, and planting evidence. Ramos-Figueroa provided details of these crimes, including testimony that he "went to the prosecutor's office. [He] presented a false sworn statement so I could take the case to Rule 6, where a cause was determined." Id. at p. 122. Defense counsel on cross-examination emphasized Ramos-Figueroa's reduced sentence:

> Defense Counsel: So other than the judge – you convincing the judge that you deserved a sentence below that 121-month to 150-month range, cooperation with the Government was the only way that you could receive a reduction in that sentence, that 17-year sentence that's scored out right there.
>
> Ramos-Figueroa: Correct.

Defense Counsel:  And so that's why you entered into a cooperation agreement with the Government; right?

Ramos-Figueroa:  Afterwards.

Defense Counsel:  You were hoping for a reduction in your sentence; right?

Ramos-Figueroa:  I was.

Defense Counsel:  All right.  Now, at the end of the day, you received a 48-month sentence; right?
Ramos-Figueroa: Correct.

Ramos-Figueroa expounded upon his criminal history:

Defense Counsel:  Okay.  You also extorted; correct?

Ramos-Figueroa:  Yes.

Defense Counsel:  Okay.  You also planted evidence; right?

Ramos-Figueroa:  Yes.

Defense Counsel:  You also falsified reports; right?

Ramos-Figueroa:  Correct.

Defense Counsel: And you also caused others to falsify reports; right?

Ramos-Figueroa:  No.

Defense Counsel:  And you also lied to Prosecutors about investigations; right?

Ramos-Figueroa:  On planting evidence, yes.

Defense Counsel:  And you also lied under oath while giving testimony in a court of law; right?

Ramos-Figueroa:  Correct.

Id. at pp. 183-184.

Against this backdrop, the Court concludes that the information set forth in the 302 reports and telephone interview is merely cumulative, impeachment evidence. The trial testimony of Lopez-Torres and Ramos-Figueroa disclosed plea and cooperation agreements with the government, reduced sentences, and past crimes and acts of dishonesty.[7] The information in the 302 reports suggest that Lopez-Torres and Ramos-Figueroa concocted testimony. Both Lopez-Torres and Ramos-Figueroa, however, confessed that they lied in the past, even while under oath. Nevertheless, the jury returned a guilty verdict.

Defendant Martinez cites to <u>United States v. Hernandez-Rodriguez</u> in support of his Rule 33 motion. 443 F.3d 138, 148 (1st Cir. 2006) (reversing the denial of a Rule 33 motion because "the district court abused its discretion by failing to consider

---

[7] The Court provided the jury with the following instruction: The fact that a witness is employed by [the] government does not by itself entitle such witness' testimony to be given more or less weight or credence than that of any other witness. You are to judge the credibility of all witnesses fairly and reasonably, and you may consider any interest that each of them may have in the outcome of the case in determining the weight to be given to their testimony. You have heard the testimony of **Pedro Lopez-Torres, Luis Ramos-Figueroa**, and Rafael Ramos-Velez. They provided evidence under agreements with the government. Mr. Lopez-Torres and Mr. Ramos-Figueroa participated in the crime charged against the defendant, and all of them received benefits from the government in exchange for providing information. Some people in this position are entirely truthful when testifying. **Still, you should consider their testimony with caution. They may have had reason to make up stories or exaggerate what others did because they wanted to help themselves. You must determine whether the testimony of these witnesses has been affected by any interest in the outcome of this case, any prejudice for or against the defendant, or by any of the benefits they may have received from the government.** You may consider their guilty pleas in assessing their credibility, but you are not to consider their guilty pleas as evidence against the Defendant in any way. (Docket No. 206 at pp. 18-20) (emphasis added).

the full import of defendant's new evidence given its decision to assume, *arguendo*, Gorbea's credibility"). The circumstances in Hernandez—Rodriguez differ substantially from those in this case. The newly discovered evidence proffered by the defendant in Hernandez-Rodriquez consisted of an affidavit from a convicted co-defendant denying that he knew defendant, lending credence to defendant's contention that he played no role in a conspiracy to import, possess and distribute a large quantity of cocaine. Id. at 143. Neither the defendant nor his co-defendant testified at trial. Id. at 141.

In this case, the newly discovered evidence presented by defendant Martinez consists of statements that some inmates at MDC allegedly heard Lopez-Torres and Ramos-Figueroa make. The Court and the jury listened to Lopez-Torres and Ramos-Figueroa for two days describe the Playamar burglary. Moreover, the Court notes that unlike the affidavit from the co-defendant in Hernandez-Rodriguez, neither Lopez-Torres nor Ramos-Figueroa have recanted their trial testimony or exculpated defendant Martinez. Id. at p. 1. The statements allegedly made by Lopez-Torres and Ramos-Figueroa suggest only that Lopez-Torres and Ramos-Figueroa were "going to say they were together at a particular place and time," and that surveillance videos might contradict their narrative. (Docket No. 210-1 at p. 1.) In Hernandez-Rodriguez, the affidavit

spoke "directly to the question of whether [defendant] knew or had
reason to know that there were drugs in the container."  443 F.3d
at 145.  The purported conversation between Lopez-Torres and Ramos-
Figueroa did not refer either to defendant Martinez or to the
subject matter of the witnesses' trial testimony.  A jury could
conclude from these statements only that Lopez-Torres and Ramos-
Figueroa have a proclivity for falsehoods and cannot be trusted.
The jury already heard evidence from which it could conclude that.
Thus, the statements summarized in the FBI 302 reports are
insufficient to satisfy the Wright materiality standard because
these statements are cumulative of the impeaching evidence already
presented at trial.

> **B.    Likelihood of an Acquittal**

        Failure to establish that the newly discovered evidence
is more than mere impeachment is fatal to defendant Martinez's
Rule 33 motion.  The Court, however, further finds that the motion
for a new trial fails pursuant to the fourth prong of the Wright
standard.  The information set forth in the 302 reports and the
telephone interview is not "sufficiently compelling that it would
**probably** result in an acquittal should the court order a retrial."
Alicea, 205 F.3d at 486; see United States v. Vigneau, 337 F.3d
62, 69 (1st Cir. 2003) ("Satisfying this fourth prong of the Wright
test is not an easy task for defendants.") (emphasis added).  To

assess newly discovered evidence, courts conduct "an evaluation of the new evidence in juxtaposition to the evidence actually admitted at trial." Josleyn, 206 F.3d at 151; Vigneau, 337 F.3d at 69 ("We do not believe that [the newly discovered evidence] is enough to overcome the abundance of evidence that was presented against [defendant] at trial."). In the context of a Rule 33 motion, "the conviction should nonetheless stand unless the force of the newly discovered event (*i.e.* the fact and nature of the perjury) and the content of the corrected testimony are such that an acquittal probably would result upon retrial." Huddleston, 194 F.3d at 221.

The government provided ample evidence for the jury to find that defendant Martinez violated section 241. By way of example, the phone records introduced by the government showed that defendant Martinez and Lopez-Torres were in contact with each other and were located within the same geographical area on the night of the burglary. Moreover, defendant Martinez has failed to explain how the evidence contained in the 302 reports would be admitted at trial in a manner consistent with the Federal Rules of Evidence. See Connolly, 504 F.3d at 216 (A motion for a new trial failed, in part, because "there has not been a credible argument put forth as to how the hearsay account contained in the FBI 302 report could be introduced into evidence."). The Court has no basis to conclude that the alleged statements, if offered at a

retrial, would probably result in an acquittal. Defendant Martinez's failure to satisfy this final prong of the <u>Wright</u> standard further warrants denial of his Rule 33 motion.[8]

## V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** defendant Martinez's motion for a new trial.  (Docket No. 210.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 8, 2017.

s/ Francisco A. Besosa<br>
FRANCISCO A. BESOSA<br>
UNITED STATES DISTRICT JUDGE

---

[8] Defendant Martinez and the government request an evidentiary hearing in connection with the Rule 33 motion.  (Docket Nos. 210, 224).  In determining whether to grant an evidentiary hearing, "the court must make a practical, commonsense evaluation." <u>Connolly</u>, 504 F.3d at 219. An evidentiary hearing to listen to cumulative impeachment evidence that would not affect the jury's verdict is unnecessary. <u>See</u>, <u>e.g.</u>, <u>Connolly</u>, 504 F.3d at 219-20 (quoting <u>United States v. Carbone</u>, 880 F.2d 1500, 1502 (1st Cir. 1989)). In <u>United States v. González-González</u>, the First Circuit Court of Appeals affirmed the district court's denial of a defendant's request for an evidentiary hearing regarding the veracity of witness testimony because "ample evidence support[ed] the jury's verdict" and the defendant "had failed to show that the alleged new evidence of perjury [. . .] warrant[ed] a new trial." 258 F.3d 16, 23-24 (1st Cir. 2001). Because the newly discovered evidence in this case is merely cumulative, and because ample evidence supports the jury verdict, the Court denies the motion for an evidentiary hearing.